RAWLS, Acting Chief Judge
(dissenting).
I dissent.
Appellant-defendant Hemmingway was charged in a four-count information of committing the crime of manslaughter. Count I charged that Hemmingway “did unlawfully, while intoxicated, by the use of intoxicating liquors, operate a motor vehicle in such a manner as to cause the motor vehicle to strike a motorcycle” causing the death of the driver. Count II charged that Hem-mingway was guilty of culpable negligence in the operation of his motor vehicle which caused the death of the driver of said motorcycle. Count III was framed as to Hem-mingway’s intoxication and Count IV as to his culpable negligence, each of which allegedly resulted in the death of a passenger on the motorcycle. A jury verdict of not guilty was returned as to the two culpable negligence counts (II and IV), and guilty as to the intoxication counts (I and III).
The basic question posed is whether the state, in the prosecution of a defendant for crime, may, in response to a proper inquiry or demand, produce or disclose less than all of the evidence or information within its knowledge and possession without depriving the defendant of due process of law.[1]
*868 On January 9, 1975, in preparation for trial, defendant’s counsel,.deposed William Alexander Stewart, a State Trooper II, traffic, homicide investigator, and a breath-olizer instructor. Stewart, testified on deposition that he became a breatholizer operator in 1969 and an instructor in 1970. Of material importance to the issue here considered are the following excerpts from Stewart’s deposition:
“Q [defendant’s counsel] All right, now, with reference to the examination which has been touched upon, that of Herschell Hemmingway, was, that on the 10th or the 11th [October, 1974]?
“A [Trooper Stewart] According to my notes, I had it as the 11th, approximately 1:19 a. m. ,:: -
“Q And, what did you do when you arrived at the jail?
“A I went in and' set up a Breatholizer machine.
“Q What did you do, then, when Mr. Hemmingway arrived?
“A Well, the first thing I did, I explained to him that I was offering to give him an approved chemical test of his breath for the purpose of determining the alcohol content in his blood. I explained to him that if he refused to take the approved chemical test that he would lose his privilege of operating a motor vehicle for a period of three, months.
“A And, then I set the machine up according to the operation procedure.
“Q Would you please describe what you did, now, in setting it up?
“A Okay, the first thing I did, I gauged an ampule, the machine—
“Q Let me just ask you this, if you will, I know you’re an instructor and I know you know these procedures, but if you will search your memory and recite what
you did with reference to that particular examination and it may be — I’m sure it is- — what you did in every one, but if-you, rather than remembering the procedure, if you will remember what you did it would be very helpful.--
“A Well, first of all, I write down on a green form, which is the checkoff list, and I wrote down the name, the model number of the machine that I was using, I wrote down the date and the only thing I did not do, I did not turn the switch on because that machine is left on, it’s like ours at our office, it’s left .on. . . .
I started the check-off list, I went through the process. I gauged the ampule, one of the standard ampules and I .put it into the left side -of the machine.
“Q What do you mean, now, when you say you gauged it?
“A There’s a gauge, a metal gauge in the machine that comes with the machine; I gauged this ampule to see that there was the proper amount of solution in this ampule.
“Q Why is it necessary to gauge it— “A This is—
“Q —to see if there is the proper amount in there?
“A —so that there will be no doubt about a high or low reading [emphasis supplied], it will give an accurate reading as long as you have the proper amount of solution in the ampule.
“A Then I inserted it in the, the unopened ampule into the machine. I took another ampule out of the box and gauged it to make sure that it had the proper amount of solution. After I had done this, I broke the top off and inserted a glass tube. . And, all this time I’m doing the check-off list because it tells me step by step, I do it automatically that way.
*869 “Q All right, if you would go ahead now, you inserted a glass tube in the ampule?
“A This is called a bubbler tube. I took that ampule and connected it to the machine by a rubber hose.
“Q And, where did you get the hose, now?
“A It’s on the machine, it’s part of the machine itself.
“Q I see, all right, now how about the bubbler tube?
“A It comes in a sealed package with a mouth piece.
“Q And, did you take a new one out of this package?
“A Yes, sir. I tore off the top of the package, I took the bubbler tube out of it, put it into the ampule and connected it to the machine. I still have the package here with the sterile mouth piece I gave to Mr. Hemmingway to blow into the machine with.
“Q . In other words, could something in the machine itself have caused the reading of .14?
“A No, sir. Because, first of all if you go by the check-off list, which I did, then you’re going to get— you’re not going to get a high reading because you’ve gone step by step.
The only way you could get a high reading against an individual would be if you did not flush that machine out or if there wasn’t the proper amount of solution in that ampule.”
During trial, the state produced two expert witnesses who testified that defendant’s blood alcohol level was .22 percent and .23 percent. The defendant took the stand in his own defense and testified as to the breatholizer being administered by Trooper Stewart, and the breatholizer report which reflected an alcohol level of .14 was introduced into evidence as defendant’s Exhibit 8. An expert witness produced by defendant testified that it would be impossible for his blood alcohol to be .22 at 12:33 a. m. (blood alcohol test) and .14 at 1:19 a. m. (breatholizer test).
It is apparent that of major strategical importance to defendant’s case was the disparity between the blood alcohol tests and the breatholizer test which the state had conducted. After the defense rested, and over the vigorous objection by defendant, the state called Trooper Stewart as a rebuttal witness. Stewart testified that the results of the breatholizer test conducted on defendant was .14. Upon further inquiry by the state, Stewart testified that he had been asked by an assistant state attorney to check out the machine he utilized for defendant’s test for its accuracy, and that upon dismantling the machine, he found' a collection of acid which caused a “low reading”. Upon cross examination, Stewart testified that he checked the machine and discovered the alleged defect “approximately four days later” (after conducting the test on October 11, 1974).
The trial court committed reversible error in permitting witness Stewart to testify on rebuttal. As reflected above, the gist of Stewart’s testimony, as an avowed expert, at the taking of his deposition on January 9, 1975 (almost three months after he discovered the alleged defect in the breatholizer machine), was that he took all necessary precautions in checking the machine to assure that the results would be accurate and “so that there will be no doubt about a high or low reading”. However, it is inescapable that at the time Trooper Stewart was deposed, he was of the opinion that the machine had produced a low reading, an opinion which he knowingly withheld from the defendant.
State v. Johnson[2] controls. There, in affirming this court’s decision reversing a criminal conviction for the failure of the trial court to require production of a police report essential to defendant’s theory of his defense, the Supreme Court observed:
“. . . the inquiry must be upon a crucial point and preferably upon a posi *870 tive statement in such a report, which the witness at trial flatly refutes, thus placing his credibility and the point involved in vital focus so that it becomes critical to the defense.”
The instant facts are, to a great extent, analogous to those recited in Johnson. This defendant relied upon the state trooper’s breatholizer test reflecting .14 percent alcohol. The trooper discovered some four days after the test that the machine he utilized rendered a “low reading”. Nonetheless, his testimony on deposition some three months later was that the .14 percent reading was accurate. Obviously, prior to trial, the trooper advised the state that the reading was low. Only when called upon as a rebuttal witness at the close of defendant’s trial did Stewart apprise defendant of this fact which was withheld. These facts fall squarely within the dictates of Brady v. Maryland.[3] As stated in Brady: “. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.”
■ I would reverse and remand for a new trial.

. Wolfe v. State, 190 So.2d 394 (1 Fla.App.1966). Another question posed by appellant relates to the cavalier manner in which the trial judge instructed the jury. I am of the view that the following instruction was improper: “If you have a reasonable doubt of his guilt, you should not find him guilty. But what is *868 reasonable doubt? It doesn’t mean the wildest conjectures- where there’s a remote possibility that maybe somebody else did it, or a remote possibility — I don’t think much of it, but— there’s a possibility it happened the way the defendant said .” (emphasis supplied)

. State v. Johnson, 284 So.2d 198 (Fla.1973). Police Reports, at 914 (1974).
See also Miami Law Rev., Vol. 28, Discovery of

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).